**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RICHARD BOWEN,

      Plaintiff,

v.

ALPHA BEDDING, LLC,

      Defendant.

Case No. 22 C 6906

Hon. LaShonda A. Hunt

## MEMORANDUM OPINION AND ORDER

Plaintiff Richard Bowen ("Bowen") brought this action against Defendant Alpha Bedding, LLC ("Alpha") claiming that Alpha's termination of the parties' commission agreement amounted to both a breach of contract and a violation of the Illinois Sales Representative Act ("ISRA"), 820 ILCS 120/0.01 *et seq.* Currently before the Court are two motions filed by Alpha—for summary judgment on all counts of the operative complaint (Dkt. 74) and for leave to amend its answer and affirmative defenses (Dkt. 81). For the reasons discussed below, the motion to amend is granted, and the motion for summary judgment is granted in part and denied in part.

## BACKGROUND[1]

Bowen started a consulting business in 2011 after spending 31 years in the healthcare manufacturing industry. (Def.'s Resp. Pl.'s SOF ¶¶ 1-2, Dkt. 83) (hereinafter, "DRSOF"). Alpha soon became one of his clients. (*Id.* ¶¶ 2-3). In 2013, Bowen identified Linet Americas ("Linet") as a potential customer for Alpha. (*Id.* ¶ 3). Bowen then advised Alpha CEO Ted Lazakis ("Lazakis") about Linet without disclosing the company's name. (*Id.* ¶ 4). Bowen told Lazakis that

---

[1] The facts are taken from the parties' Local Rule 56.1 Statements and are undisputed, unless otherwise noted.

he would reveal the potential customer's identity once Bowen and Alpha had a formalized commission agreement. (*Id.* ¶ 4).

On May 31, 2013, Bowen sent Lazakis an email with proposed contractual terms stating:

> Based on our discussion on Tues I thought I would have a confirming e-mail this week. As we have discussed over the last 6 months, you will confirm the following commissions:
>
> Smart Medical purchases-10%
> New company (will share the name upon agreement)-5%

(Pl.'s SOF, Ex. 5, at 677, Dkt. 80-5).[2] Lazakis followed up on June 4, 2013, memorializing the agreement by confirming that he agreed "to provide a 10% sales commission on Smart Medical Technology purchases," and a "5% commission on the sales to the New Company." (*Id.*). Lazakis also noted that "[t]hese commissions will continue as long as we do business with these customers while you are providing representation to us. I agree to pay a residual commission at the full rate for a period of five years after your relationship with our company ends." (*Id.*). Finally, Lazakis stated that "[w]e will expect you to present yourself to customers as an independent representative and not an employee of Alpha." (*Id.*). Both sides concur that these are the terms of their agreement ("Agreement"). (DRSOF ¶ 9). Bowen then advised Alpha of the potential for orders with Linet once they confirmed the Agreement in writing. (*Id.* ¶ 10).

During the negotiation period between Bowen and Alpha, however, Bowen and Linet VP of Sales George Errington ("Errington") were in talks about Linet's potential employment of Bowen. (*Id.* ¶ 5). Bowen informed Linet about his consulting business and Errington allegedly stated he "had no problem with it." (*Id.* ¶¶ 5-6). In a letter dated June 3, 2013, the day before Bowen and Alpha memorialized their Agreement, Linet offered Bowen the position of "Sales

---

[2] Page numbers in citations refer to the "PageID" in the CM/ECF header, not "Page __ of __" in the CM/ECF header or any page number appearing in the footer.

Manager – Mattress Replacement Systems," with a $35,000 base salary plus commission. (Def.'s SOF, Ex. 6, at 455-457, Dkt. 75-6). Bowen accepted the offer no later than June 6, 2013, as evinced by the executed offer letter and employee acknowledgement documents signed by Bowen on that date. (*Id.*, Exs. 6-7, at 462-465; DRSOF ¶ 13).[3]

The parties dispute whether Bowen informed Alpha that he was employed, or to be employed, by Linet at the time they executed the Agreement and whether Alpha consented to Bowen's employment by its potential customer. (DRSOF ¶ 14). Bowen points to a handwritten note of Lazakis which includes Bowen's name, the date "6/14/13" and the following references under the heading "Linet"—"made him an offer?" "probably will accept." (PRSOF ¶¶ 25-26). Bowen also point to an email he sent to Lazakis from a "linetamericas.com" email address in September 2014 (Dkt. 80-7), which Lazakis then forwarded to an Alpha employee in sales and marketing a month later stating "FYI good review from Linet," as additional proof that Alpha had been aware of Bowen's employment with Linet.

After years of working together, Lazakis emailed Bowen on May 25, 2021, stating that he wanted to revise the Agreement. (Pl.'s Resp. Def.'s SOF ¶ 50, Dkt. 78) (hereinafter, "PRSOF"). The revisions included a change to the method of calculation of Bowen's commission rates. (*Id.* ¶ 51). The parties could not agree on new terms by the self-imposed September 1, 2021, deadline. (*Id.* ¶ 55). Alpha then terminated the agreement due to the failure to reach new terms. (*See* DRSOF ¶¶ 16, 27).

Unhappy with the termination and alleged unpaid commissions, in August 2022, Bowen filed suit against Alpha in the Circuit Court of the Nineteenth Judicial Circuit of Lake County,

---

[3] The offer letter is signed by Bowen and next to his signature is the date June 6, 2013. (Def.'s SOF, Ex. 6, at 456). The employee acknowledgement is also signed by Bowen but includes two dates—June 5, 2013 and June 6, 2013. (*Id.*, Ex. 7, at 462-465). Determining the correct date is not pertinent to the Court's analysis.

Illinois. (*See* Notice of Removal, Ex. A, at 17-18, Dkt. 1-1). Alpha removed the case to federal court in December 2022, asserting diversity jurisdiction. (*See id.*). Plaintiff then amended his complaint on two occasions, culminating in the four-count second amended complaint seeking compensatory and equitable relief for—(1) equitable accounting under Illinois common law; (2) alternatively, breach of contract under Illinois common law; (3) declaratory judgment related to the Agreement; and (4) violations of the ISRA. (SAC at ¶¶ 1-41, Dkt. 36).

Following a year of discovery, Alpha moved for summary judgment contending that both of the contractual claims fail under the defenses of illegality and misrepresentation by omission, the ISRA claim fails because he was not a "sales representative" under the ISRA, and the equitable accounting claim fails because Bowen has adequate remedies at law. (MSJ, at 354, Dkt. 74). Bowen conceded that his equitable accounting claim cannot proceed, but argues that there are disputes of material fact as to the other counts, and because Alpha did not plead illegality as an affirmative defense, it should not be permitted to rely on that theory to obtain summary judgment. (Resp. MSJ, at 576-589, Dkt. 77). Bowen's argument prompted Alpha to file a motion to amend its answer to include the illegality affirmative defense. (Mot. Am., Dkt. 81). These motions are fully briefed.

## **DISCUSSION**

## I.    **Motion to Amend Answer and Affirmative Defenses**

After raising an affirmative defense in its summary judgment papers that it did not plead, Alpha moved for leave to amend its answer to include an illegality defense. (*See* Mot. Am., Dkt. 81). Alpha argues that the Court should grant its request to amend because the parties explored evidence related to the defense during discovery; therefore amendment does not prejudice Bowen. (*Id.* at 757-758). Bowen, on the other hand, asserts that Alpha has waived its defense. (Resp. Mot.

Am., at 827, Dkt. 86). The Court finds that justice warrants granting Alpha the opportunity to amend its answer and present its defense.

Under Rule 8(c), a party must set forth in a responsive pleading all enumerated defenses, including illegality, and "any other matter constituting an avoidance or affirmative defense." Fed. R. Civ. P. 8(c). "The purpose of requiring affirmative defenses to be pleaded is to give the opposing party notice and the opportunity to respond." *First Am. Bank v. W. DuPage Landscaping, Inc.*, No. 00 C 4026, 2005 WL 991892, *3 (N.D. Ill. Apr. 11, 2005) (citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971)). Rule 7 "clarifies that the use of the word 'pleading' in Rule 8 includes the answer, but not other motions." *Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000).

"An affirmative defense is waived when it has been knowingly and intelligently relinquished and forfeited when the defendant has failed to preserve the defense by pleading it." *Burton v. Ghosh*, 961 F.3d 960, 965 (7th Cir. 2020). "A district court may, however, exercise its discretion to allow a late affirmative defense if the plaintiff does not suffer prejudice from the delay." *Id.*; *see also* Fed. R. Civ. P. 15(a)(2) (courts should freely grant leave to amend pleadings when justice requires). The Seventh Circuit instructs that in this context "prejudice" does "not mean whether the defense will succeed on the merits and cause the plaintiff to lose. [It] mean[s] unfair prejudice, meaning that the late assertion of the defense causes some unfairness independent of the potential merits of the defense." *Burton*, 961 F.3d at 965.

For example, in *DuPage Landscaping*, the court found the illegality defense waived where the defendant raised it for the first time in its motion for summary judgment. 2005 WL 991892, *4. In that case, the plaintiff pled information in its complaint giving rise to the illegality defense, so the court found the issue "apparent from the outset." *Id.* Furthermore, the defendant failed to

5

establish that it did not receive information related to the defense in a timely fashion during discovery and also did not subsequently move to amend its pleadings. *Id.* Based on these factors, the district court found the illegality defense waived. *Id.*

In contrast, in *Robinson v. Sappington*, the Seventh Circuit held that a district court did not abuse its discretion when it allowed the defendants to amend their pleadings at summary judgment to add affirmative defenses. 351 F.3d 317, 332-333 (7th Cir. 2003). There, the Seventh Circuit identified two aspects of the record which showed that the plaintiff had sufficient notice of the affirmative defenses the defendants intended to pursue. *Id.* at 333. Specifically, it found that counsel for the defendants put the plaintiff on notice of the affirmative defenses when they explored related facts during the plaintiff's deposition. *Id.* The court also found sufficient notice because defendants raised the defenses in their memoranda supporting their motion for summary judgment, which then gave the plaintiff an opportunity to respond to their arguments in her opposition brief. *Id.* Additionally, the fact that the plaintiff did not demonstrate she was prejudiced by the late amendment, led the Seventh Circuit to affirm the trial court's decision to allow a late amendment of the pleadings at the time of summary judgment briefing. *Id.*

The case at bar is more like *Robinson* than *DuPage Landscaping* for several reasons. First, unlike *DuPage Landscaping*, there is no information in the SAC (or the preceding complaints) that establishes the Agreement is unenforceable and void because of "illegal" behavior. Bowen does not allege that Alpha terminated the Agreement because it learned of his purported double-agent work as an independent sales representative doing business for Alpha and as an employee of Linet. He merely alleges that "[a]s a result of Bowen's objections" to Alpha's new method of calculating commissions, "the [Agreement] was terminated by Alpha in August 2021." (SAC at ¶¶ 15-18). In fact, outside of Bowen's consulting business, "RB Consulting," which is "a trade name and is not

a separate [legal] entity such as a corporation or [LLC]," the SAC makes no reference to any other employment relationships Bowen may have had with third parties—Linet or otherwise. (*See generally*, *id.* ¶¶ 2-3).

Second, a review of the record reveals that Alpha focused on the illegality defense starting with the deposition of Bowen on October 9, 2023.[4] It is uncontested that just over a week after that deposition Alpha provided Bowen with notice of a subpoena to be issued to Linet for the purposes of obtaining "[a]ll documents, correspondence and communications" that relate to:

> Bowen's employment with LINET . . . relating to ethics, code of conduct, bribery, conflict of interest, moonlighting, self-dealing, receiving gifts from customers, suppliers and vendors and any other policy that prohibits employees from obtaining or accepting commissions, compensation or gifts from suppliers, vendors or customers of LINET.

(Mot. Am., at 754, 765-766) (capitalization in original). In addition, Alpha requested "[a]ll correspondence and communications between George Errington and Richard Bowen regarding Linet approving Richard Bowen to continue his consulting services while an employee of LINET, specifically including receiving commissions from Alpha Bedding, LLC on sales it made to Linet." (*Id.* at 754, 766) (capitalization in original).

Alpha also supplemented its Rule 26(a)(1) disclosures on October 31, 2023, to include Andrew Aitken, director of product management marketing at Linet, as a person who is likely to have discoverable information regarding Alpha's defenses because "[h]e may have knowledge regarding . . . Linet's policies [regarding] moonlighting, self-dealing, kickbacks, confidentiality, etc." and Bowen's "employment relationship with Linet." (*Id.* at 754-755, 759). Bowen even stated

---

[4] Presented as evidence in the record supporting waiver, Bowen identifies Alpha's statement in its September 21, 2023 response to Bowen's motion to compel that states documents between it and "[Bowen]'s customers prior to August 2021 are not relevant to any claim or defense at issue." (Resp. Mot. Am., at 822). However, that fact supports Alpha's argument that it was unaware of any purported illegality defense until Bowen's October 9, 2023 deposition.

in a joint status report shortly after the close of discovery that because Alpha "disclosed an additional witness" in its supplemental disclosure, Bowen's counsel was "considering whether or not they will need to depose that deposition. Other than that possible deposition, the Parties have completed all fact discovery." (Joint Status Report, at 331, Dkt. 59).[5]

Third, like the plaintiff in *Robinson*, Bowen has not suggested he would be prejudiced in any way by Alpha's assertion of the illegality defense. Instead, his opposition to the motion is a screed discussing counsel's disdain for the other side, along with the procedural history of the case and a review of the case law cited by Alpha, as opposed to specifics about prejudice resulting from allowing the amendment. (*See generally*, Resp. Mot. Am., at 820-832) (discussing procedural history, stating Alpha has not engaged in "good faith advising of the Court" and is "sandbag[ging]," and reviewing case law cited by Alpha).

Fourth, "the defense was raised in the memoranda supporting [Bowen's] motion[s] for summary judgment [and to amend its answer], and [Bowen] had an opportunity to respond to [Alpha's] arguments in favor of that defense in h[is] opposition brief[s]." *Robinson*, 351 F.3d at 333. "The record, therefore, shows that [Bowen] and [his] counsel were aware that [Alpha] w[as] seeking evidence in support of the [illegality] defense" and will not be unfairly prejudiced by its arrival independent of the potential merits of the defense. *Id.*

As a final note, Rule 15(a)(2) instructs that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). And Rule 1 provides how the plain language of that instruction is to be "construed, administered, and employed." Fed. R. Civ. P. 1. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive

---

[5] Bowen also does not deny Alpha's assertion, (Mot. Am., at 755), that it notified him of the illegality defense during and in connection with a settlement conference before Judge McShain on January 9, 2024. (*See* Resp. Mot. Am., at 825)

to the outcome and affect the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Woods v. Indiana Univ.-Purdue Univ. at Indianapolis*, 996 F.2d 880, 884 (7th Cir. 1993). Therefore, "spirit and inclination of the rule favor[s] decisions on the merits." *Schiavone v. Fortune*, 477 U.S. 21, 27 (1986).

Accordingly, finding that "justice so requires," the Court grants Alpha's motion for leave to amend to add an affirmative defense of illegality.

## II.    **Motion for Summary Judgment**

Summary judgment is proper when there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Med. Protective Co. of Fort Wayne, Ind. v. Am. Int'l Specialty Lines Ins. Co.*, 990 F.3d 1003, 1008 (7th Cir. 2021). Summary judgment "requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Alpha argues that it is entitled to summary judgment on Bowen's contractual and related declaratory judgment claims (counts II-III) because the Agreement is void under the theories of illegality and misrepresentation by omission, and Bowen's ISRA claim (count IV) fails because Bowen is not a "sales representative" under the ISRA. (Def.'s Mem. Supp., at 494-496, Dkt. 76). Conversely, Bowen counters that the record contains triable issues of fact on his claims, and he easily fits within the ISRA's definition of "sales representative." (Resp. MSJ, at 576-589). The Court agrees with Bowen that summary judgment is not proper.

A. **Illegality**

"Courts will not enforce an illegal contract, a contract that expressly contravenes either Illinois or Federal law and thus violates public policy." *Gamboa v. Alvarado*, 941 N.E.2d 1012, 1017 (Ill. App. Ct. 2011). A contract is illegal for public policy reasons if the conduct it contemplates is "clearly contrary to what the constitution, statutes or court decisions have declared," or if it is "manifestly injurious to the public welfare." *Swavely v. Freeway Ford Truck Sales, Inc.*, 700 N.E.2d 181, 187 (Ill. App. Ct. 1998). The public policy exception is narrow and renders a contract unenforceable only if the contract violates an "explicit public policy." *Kingsbury Capital, Inc. v. Kappel*, No. 20 C 800, 2020 WL 5512136, at *5 (N.D. Ill. Sep. 14, 2020). In other words, "[t]he public policy must be 'well-defined' and 'dominant' and derived from legislation and caselaw rather than assumed public interests." *Id.* (quoting *Colmar, Ltd. v. Fremantlemedia N. Am., Inc.*, 801 N.E.2d 1017, 1030 (Ill. App. Ct. 2003)).

"In determining if a public policy exists, Illinois courts look first to the State's constitution and statutes and then to judicial precedent." *Kingsbury*, 2020 WL 5512136, at *5. The Court must determine whether a well-defined and dominant public policy can be identified, and, if so, then the Court must determine whether enforcement of the Agreement violates that public policy. *Colmar, Ltd.*, 801 N.E.2d at 1030.

Under Illinois law, "[a] fiduciary relationship exists as a matter of law between a principal and agent." *Lippert Mktg. v. Kingwood Ceramics*, No. 95 C 6490, 1996 WL 648705, at *3 (N.D. Ill. Oct. 16, 1996); *see also Great Scott Nat'l Sales, Inc. v. Scott*, No. 24 C 2051, 2025 WL 1518053, at *4 (N.D. Ill. May 28, 2025) ("The law recognizes a fiduciary duty in certain relationships, such as attorney-client or principal-agent relationships."). "Where a fiduciary engages in self-dealing without the knowledge or permission of its principal, the transaction is

10

voidable at the option of the principal." *Sphere Drake Ins. v. All Am. Life Ins. Co.*, 221 F. Supp. 2d 874, 879-880 (N.D. Ill. 2002) (citing *Home Federal Savings & Loan Association of Chicago v. Zarkin*, 432 N.E.2d 841, 846 (Ill. 1982)).[6]

"Courts applying Illinois law have construed the duty of loyalty to prohibit [fiduciaries] from improperly competing with their employer, soliciting the employer's customers, enticing co-workers away from the employer, diverting business opportunities, engaging in self-dealing and/or otherwise misappropriating the employer's property or funds." *Beltran v. Brentwood N. Healthcare Ctr.*, LLC, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006); *see also Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (employees who exploit positions with employer for own benefit to detriment of employer's customer relationships face liability for breach of fiduciary duty); *TMF Tool Co., Inc. v. Siebengartner*, 899 F.2d 584, 589 (7th Cir. 1990) (officer who commingled funds to pay personal debts breached fiduciary duty); *RKI, Inc. v. Grimes*, 177 F. Supp 2d 859, 877 (N.D. Ill. 2001) (breach of duty of loyalty to download confidential client information during the course of employment then use that information to compete with the employer); *Ladenberger v. Gen. Signal Pump Group/Aurora Pump*, No.00 C 4054, 2001 WL 709488, at *5 (N.D. Ill. June 22, 2001) (breach of duty of loyalty for employee to take advantage of property or knowledge acquired in employer's business to make profit for self at expense of employer); *Riad v. 520 S. Mich Ave. Assocs.*, 78 F. Supp. 2d 748, 763 (N.D. Ill. 1999) (employee who solicits customers or co-workers away from employer may be liable for breaching duty of loyalty); *LaSalle Bank Lake View v. Seguban*, 937 F. Supp. 1309, 1324 (N.D. Ill. 1996) (bank employee who embezzled funds from employer breached fiduciary duty); *ABC Trans Nat'l*

---

[6] "While *Zarkin* was superseded by a statutory amendment, the holdings regarding fiduciary duties and self-dealing have not been overruled." *Meaden v. Meaden*, No. 12 C 3534, 2012 WL 6019233, at *5 n.2 (N.D. Ill. Nov. 30, 2012)

11

*Transp., Inc. v. Aeronautics Forwarders, Inc.*, 379 N.E.2d 1228, 1237-1238 (Ill. App. Ct. 1978) (breach of duty of loyalty for employee to continue working for principal after establishing a rival business). In short, agents are "obligated to act solely for the benefit of the p[rincipal] in all matters connected with [their] agency, and to refrain from competing with the p[rincipal]." *Mullaney, Wells & Co. v. Savage*, 402 N.E.2d 574, 580 (Ill. 1980)

"An agency relationship arises when a principal 'manifests assent' to an agent that will act on the principal's behalf and subject to the principal's control, and the agent consents so to act." *Newman v. Integrity Mktg. Grp., LLC*, No. 24 CV 3188, 2025 WL 358933, at *2 (N.D. Ill. Jan. 31, 2025) (quoting Restatement (Third) of Agency § 1.01 (2006)). Agents owe their principals fiduciary duties of loyalty, good faith, and honesty. *Gorski v. Cainkar (In re Estate of Sergo)*, 2016 WL 6268093, at *12 (citing *ARTRA Group, Inc. v. Salomon Brothers Holding Co.*, 680 N.E.2d 769, 772 (Ill. App. Ct. 1997)). "They must not engage in self-dealing or otherwise take actions contrary to the best interests of those to whom such duties are owed." *Id.* (citing *Blanchard v. Lewis*, 112 N.E.2d 167, 172 (Ill. 1953) ("The law of agency and the declared public policy of this State strictly require honesty and loyalty to the interests of the principal on the part of an agent.")). "All that is required is that the *creation* of the agency relationship involve peculiar trust and confidence, with reliance by the principal on the fair dealing by the agent." *Martin v. Heinold Commodities*, 643 N.E.2d 734, 741 (Ill. 1994) (emphasis in original). It is undisputed that Alpha deputized Bowen to act on its behalf to introduce Alpha to new customers and assist with "delivery, pricing or product quality issues" that may arise with those clients. (DRSOF ¶ 16, at 783-784). Therefore, an agency relationship existed between Bowen and Alpha.

In addition, there is no dispute that Bowen also was an agent of Linet, a customer of Alpha, at the same time he was an agent of Alpha. The law of Illinois imposes upon the agent "a burden

of proving full honesty and loyalty, or, in the alternative, full disclosure and subsequent ratification by the principal, whenever any question relating to the faithfulness of the agent arises in an action brought by an agent against his principal." *Blanchard*, 112 N.E.2d at 172; *see also* Restatement (Second) of Agency § 390, Comment a (1958) ("One employed as agent violates no duty to the principal by acting for his own benefit if he makes a full disclosure of the facts to an acquiescent principal and takes no unfair advantage of him."). Illinois law "prohibits an agent from acquiring personal interests adverse to those of his principal and from dealing independently of the interests of his principal to his personal gain in the subject matter of the agency." *Blanchard*, 112 N.E.2d at 172; *see also Miller v. Harris*, 985 N.E.2d 671, 679 (Ill. App. Ct. 2013) ("An agent must not place himself in a position which is adverse to that of his principal during the existence of the agency.").

"The conflicting interests of two principles can place a strain upon the integrity of the agent, who might be inclined to favor one over the other or to exercise his discretion in accordance with the wishes of one." *Regnery v. Regnery*, 570 N.E.2d 557, 563 (Ill. App. Ct. 1991). "Accordingly, because a principal is entitled to the unbiased judgment of his agent, an agent should not act for two parties whose interests conflict." *Id.*; *see also Bunn v. Keach*, 73 N.E. 419, 420 (Ill. 1905) ("Where an agent acts for both parties in a contract requiring the exercise of discretion, the double agency is available as a defense in an action on the contract."); *Hafner v. Herron*, 46 N.E. 211, 212 (Ill. 1896) ("It is well settled, that the same man cannot act at the same time as agent for both seller and buyer. His duty to one is inconsistent with his duty to the other.").

For example, in *Beaton* the court found that an independent consultant breached fiduciary duty to his principal by accepting a secret referral fee from another consultant he recommended to his principal. *Beaton & Assoc. v. Joslyn Mfg. & Supply Co.*, 512 N.E.2d 1286, 1291 (Ill. App. Ct.

1987). And in *Foodcomm*, the Seventh Circuit applied Illinois law and found fiduciaries who "exploit their positions within [the principal] for their own personal benefit" or fail to inform the principal that they are "engaging in other fiduciary breaches," violate their fiduciary duty to the principal. *Foodcomm Int'l*, 328 F.3d at 304. These examples find support in the Restatement (Third) of Agency, which instructs that "an agent who acts on behalf of more than one principal in a transaction between or among the principals has breached the agent's duty of loyalty to each principal through undertaking service to multiple principals that divides the agent's loyalty." Restatement (Third) Of Agency § 8.03 (2006).

"Perhaps the most important component of this duty of loyalty is a[n agent's] legal obligation to inform [his principal] with fairness, promptness and completeness concerning all facts within his knowledge which are, or may be, material to the situation in connection with his employment." *Frey v. Fraser Yachts*, 29 F.3d 1153, 1156 (7th Cir. 1994) (interpreting both Illinois and Florida law). When an agent acts in willful or deliberate breach of the fiduciary duty of loyalty to the principal, the agent "could not expect compensation . . . for the period of time in which the agent was disloyal." *Clinton Imperial China, Inc. v. Lippert Mktg., Ltd.*, 878 N.E.2d 730, 737 (Ill. App. Ct. 2007). A principal, however "may consent to conduct by an agent that would otherwise breach the agent's duty." Restatement (Third) Of Agency § 8.06 (2006); *see also Manda v. Branham*, 365 N.E.2d 216, 219 (Ill. App. Ct. 1977) ("[O]ne may act as agent for both parties to a transaction if it be with their full knowledge and consent.").

Here, Bowen and Alpha entered into the Agreement around June 4, 2013, which required Alpha to pay him 5% commission on all sales to an undisclosed potential customer. (*See* 2d Am. Compl., Ex. A, at 206; PRSOF ¶¶ 18-19, at 596). That potential customer was Linet. (PRSOF ¶ 21, at 596-597). On or around June 6, 2013, Bowen accepted employment with Linet. (Def.'s SOF,

14

Ex. 7, at 462-465; DRSOF ¶ 13). In sum, Bowen became a fiduciary of Alpha on June 4, 2013, at the latest,[7] and introduced Alpha to a client in his role as a fiduciary of Alpha that turned out to be another principal-employer of Bowen. Bowen therefore was acting as a fiduciary of both sides of the transaction.

Based on the foregoing, the Court finds that the undisputed facts establish that Bowen breached his duty of loyalty to Alpha during the existence of the Agreement by working for its customer and receiving commission on sales to said customer. (PRSOF ¶¶ 22-24, at 597-598).[8] However, there is a dispute of material fact concerning whether Alpha consented to Bowen's dual loyalty. According to the relevant timeline, on May 31, 2013, Bowen sent an initial email to Lazakis about a commission agreement, to which Lazakis responded days later on June 4, 2013, confirming the terms of their deal. At the same time, Linet offered Bowen a position on June 3, 2013, which Bowen accepted days later on June 5 or 6, 2013. The Court notes that Bowen was somewhat coy in testifying at one point he told Lazakis that Linet wanted to hire him but then also suggesting he would have no obligation to say anything because he did not accept the Linet position until *after* he had already reached agreement with Alpha on June 4, 2013.

Notwithstanding this potential contradiction, Alpha bears the burden on proving its entitlement to summary judgment. And here, Bowen counters with two pieces of crucial evidence in the record for which Alpha has not offered a convincing explanation. First, Lazakis' own notes

---

[7] "If . . . the creation of the relation involves peculiar trust and confidence, with reliance by the principal upon fair dealing by the agent, it may be found that a fiduciary relation exists prior to the employment and, if so, the agent is under a duty to deal fairly with the principal in arranging the terms of the employment." *Martin*, 643 N.E.2d at 741 (quoting Restatement (Second) of Agency § 390, Comment *e* (1958)).

[8] *See also Hafner*, 46 N.E. at 212 ("[I]t makes no difference whether the result of the agent's conduct is injurious to the principal or not; in such case, the misconduct of the agent affects the contract from considerations of public policy rather than of injury to the principal. It matters not, that there was no fraud meant, and no injury done. The rule is not intended to be remedial of actual wrong, but preventive of the possibility of it.") (quotes omitted).

dated June 4, 2013 seem to indicate that he was in fact aware that Linet and Bowen were discussing employment that Bowen would likely accept. Second, the September 2014 email from Bowen using a Linet email address, although sent over a year later, apparently did not raise any red flags for Lazakis, as he forwarded the email to another Alpha employee with a note about a good review from Linet. At least by September 2014, it was clear that Bowen was working for Linet in some capacity; and yet Lazakis did not terminate the arrangement with Bowen until September 2021, seven years later. Because a reasonable jury could find under these circumstances that Alpha consented to Bowen working for Linet simultaneously, this is a material factual dispute that must be resolved by the trier of fact.

If consent is not proven at trial, Bowen's acts and omissions would constitute a breach of his fiduciary duty to Alpha without permission. *See Foodcomm Int'l*, 328 F.3d at 304 (finding that fiduciaries may have violated their fiduciary duty if they exploited their positions for personal benefit or concealed their fiduciary breaches from principal); *Beaton*, 512 N.E.2d at 1291 ("The agent breaches this duty not only when he acts adversely to the principal's interest, but also when he conceals facts that involve the principal's advantage."). If so, the Agreement may be set aside because, as the Illinois Supreme Court instructs, "[i]t has long been the settled law in this jurisdiction" that, where it appears that "the confidential relation[ship] has been abused, the contract or transaction will be set aside, even though it is such that it would not be disturbed had no fiduciary relation existed." *Kai v. Bd. of Dirs. of Spring Hill Bldg. 1 Condo. Ass'n*, 171 N.E.3d 42, 54 (Ill. App. Ct. 2020) (quoting *Moehling v. W. E. O'Neil Constr. Co.*, N.E.2d 100, 106 (Ill. 1960)). But these are questions the Court cannot reach yet as a matter of law.

Accordingly, summary judgment is denied as to the illegality defense.

16

### B. <u>Misrepresentation</u>

For the same reasons that Alpha's illegality defense is not appropriate for disposition on summary judgment, the Court also cannot determine whether the Agreement is void because of an alleged misrepresentation by omission. "Fraud in the inducement of a contract is a defense that renders the contract voidable at the election of the injured party." *Cannon v. Burge*, 752 F.3d 1079, 1092-1093 (7th Cir. 2014). A representation constitutes a fraud that would permit a court to set aside a contract where the party seeking such relief establishes that the representation was: (1) one of material fact; (2) made for the purpose of inducing the other party to act; (3) known to be false by the maker, or not actually believed by him on reasonable grounds to be true, but reasonably believed to be true by the other party; (4) was such that the injured party would have acted differently had they been aware of it; and (5) was relied upon by the other party to his detriment. *See Jordan v. Knafel*, 880 N.E.2d 1061, 1069 (Ill. App. Ct. 2007); *Schrager v. N. Cmty. Bank*, 767 N.E.2d 376, 384 (Ill. App. Ct. 2002). "An affirmative statement is not always required, however, and fraud may also consist of the omission or concealment of a material fact if accompanied by the intent to deceive under circumstances which create the opportunity and duty to speak." *Warren Chevrolet, Inc. v. Bemis*, 555 N.E.2d 101, 103 (Ill. App. Ct. 1990). A duty to disclose arises if "plaintiff and defendant are in a fiduciary or confidential relationship." *JTG Equities, LLC v. Greenberg*, No. 18 C 7927, 2019 WL 2866713, at *3 (N.D. Ill. July 3, 2019).

Once the parties entered into a fiduciary relationship, they owed each other a duty to fully disclose material facts adverse to the interests of the other party. *Emerging Indus. Techs., Inc. v. Fid. Nat'l Info. Servs., Inc.*, No. 23-CV-5922, 2024 WL 3791475, at *17 (N.D. Ill. Aug. 13, 2024) ("A duty to disclose may be based on a fiduciary relationship or a relationship of trust and confidence where defendant is in a position of influence and superiority over plaintiff."); *Halperin*

17

*v. Halperin*, 750 F.3d 668, 671-672 (7th Cir. 2014) (instructing that under Illinois law, "mere silence on [the fiduciary's] part [regarding] . . . the facts giving rise to . . . his duty to disclose, amounts to a fraudulent concealment"). Again, there is a genuine dispute as to whether Bowen disclosed that he was a fiduciary of Linet while he was also a fiduciary to Alpha. Similar to the illegality defense, if proven at trial that Bowen never informed Alpha of his parallel fiduciary duties, Bowen had an intent to deceive Alpha with his omission, Alpha would have acted differently if they had been aware, and Alpha relied upon the omission to its detriment, Bowen's malfeasance would amount to a fraudulent concealment of a material fact to Alpha that may void the Agreement. Any such determination as a matter of law, however, would be premature.

Accordingly, summary judgment is denied as to the fraudulent concealment defense.

### C.    Illinois Sales Representative Act Claim (Count IV)

The ISRA creates a cause of action for a principal's failure to pay "commissions due at the time of termination of a contract between a sales representative and principal . . . and commissions that become due after termination." 820 ILCS 120/2.[9] The parties do not dispute that Alpha is a "principal" under the ISRA because it is a purveyor of tangible goods. *See Nicor Energy v. Dillon*, No. 03 C 1169, 2004 WL 51234, at *2 (N.D. Ill. Jan. 7, 2004) (stating that the ISRA only applies to principals that are "purveyors of tangible goods, not services"); *see also Kenebrew v. Connecticut Gen. Life Ins. Co.*, 882 F. Supp. 749, 754 (N.D. Ill. 1995) (ISRA inapplicable to commissions allegedly earned by insurance agents in servicing and maintaining policy plans for prepaid health insurance). The parties dispute only whether Bowen is a "sales representative"

---

[9] The ISRA requires "termination of a contract" before liability attaches. 820 ILCS 120/2. "Claims under the ISRA, in other words, presuppose the existence of a valid sales representatives' contract." *AA Sales & Assocs. v. Coni-Seal, Inc.*, 550 F.3d 605, 609 (7th Cir. 2008)."Thus, [Bowen's] claim under the ISRA is parasitic on [his] breach of contract claim: if [he] is entitled to commissions under the parties' contract, then the dismissal of [his] ISRA claim [is proper]; otherwise not." *Id.*

under the ISRA. Alpha argues that Bowen did not "solicit orders" within the meaning of the ISRA, therefore he is not a "sales representative" under it. (Def.'s Reply, at 807, Dkt. 84). Bowen maintains that there is a material fact dispute on this issue. (Resp. MSJ, at 576-580). The Court agrees with Bowen.

The ISRA defines"[s]ales representative" as "a person who contracts with a principal to solicit orders and who is compensated, in whole or in part, by commission . . . ." 820 ILCS 120/1(4). The parties do not dispute that they had a valid contract with a principal or that Bowen was compensated pursuant to that contract via commission. They just disagree whether that contract was made to "solicit orders." The term "solicit orders" is not defined by the ISRA. Adopting the dictionary definition, one court in this District determined that the term "solicit" means "to approach with a request or plea; to strongly urge." *Freedman Sales, Ltd. v. Yale Sec., Inc.*, No. 97 C 4441, 1998 WL 111677, at *1 (N.D. Ill. Mar. 12, 1998) (quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1986)); *see also Liu v. T&H Mach., Inc.*, No. 96C6952, 1998 WL 355444, at *3 (N.D. Ill. June 24, 1998) ("To solicit means to approach with a request or to strongly urge."). One court using this definition of "solicit" also found at the summary judgment stage that where a sales agent "negotiated on behalf of [the principal] to sell its products to [the customer] and [the principal] agreed to pay [the sales agent] more after the sale[,] . . . [the] contractual arrangement between [the principal and agent] [was] sufficient to satisfy the statutory definition of solicitation" under the ISRA. *Liu*, 1998 WL 355444, at *3.

This situation is no different. Alpha denies that Bowen solicited orders but also admits that "his role was limited to introducing Alpha Bedding to new customers and occasionally assisting with addressing delivery, pricing or product quality issues." (DRSOF ¶ 16, at 783-784). Alpha also admits that it agreed to pay Bowen "5% of commissions on sales to the New Company," the name

of which Bowen would disclose once the parties had an agreement. (Def.'s SOF, Ex. 5, at 453, Dkt. 75-5). And that Bowen helped establish "supplier relationships" between customers and Alpha. (DRSOF ¶ 16, at 783-784). Alpha also stated, in the email to Bowen which memorialized their Agreement, that Bowen is to present himself as an "independent representative" of Alpha. (Def.'s SOF, Ex. 5, at 453). These facts and admissions make Alpha's argument that Bowen did not solicit orders for Alpha disingenuous.

Alpha relies exclusively on *Clinton Imperial China*, for its argument that Bowen is not a sales representative under the ISRA. In that case, a sales agent helped a manufacturer find a retail distributor for its products. 878 N.E.2d at 733. However, at the time of the execution of the contract at issue, the sales agent there "had no responsibility for soliciting orders" because the customer contacted the principal directly "rather than [the sales agent], for orders and service." *Id.* at 739. These facts led the court to conclude that the sales agent did not qualify as a "sales representative" under the ISRA. *Id.*

The instant case is distinguishable from *Clinton Imperial*. At the time of the Agreement's execution, Alpha had no connection to Linet and was waiting for Bowen to approach Linet to urge it to do business with Alpha. In fact, the Agreement contemplated this reality as Linet is listed as "New Company" in the email offer sent by Alpha to Bowen. (DRSOF ¶ 9, at 778-779; Def.'s SOF, Ex. 5, at 453). Alpha also admits that Bowen assisted with servicing new customers and occasionally assisting with addressing delivery, pricing or product quality issues. (DRSOF ¶ 16, at 783-784). Even though the Court questions whether servicing customers is required to fit into the ISRA's "sales representative" box, these facts are consistent with *Clinton Imperial* and undercut Alpha's argument that this Court is required to find that Bowen cannot satisfy the statutory definition. *See* 820 ILCS 120/1(4) (defining a "[s]ales representative" as a person "who

contracts with a principal to *solicit* orders" and who is compensated "by commission," but says nothing about post-soliciting "service").

At bottom, the undisputed facts establish that Bowen was an independent representative of Alpha and received commissions on sales of tangible goods to companies, including Linet, that Bowen approached to establish a business relationship with Alpha. Based on the record, the Court finds that there is, at minimum, a factual dispute concerning whether Bowen is a sales representative under the ISRA.

Accordingly, summary judgment is denied as to the ISRA claim.

## **CONCLUSION**

For all the foregoing reasons, Defendant's motion to amend its answer and affirmative defenses is granted, and Defendant's motion for summary judgment is granted as to Count I of the second amended complaint and denied as to Counts II, III, and IV.


**DATED**: September 23, 2025    **ENTERED**:

LaShonda A. Hunt
LASHONDA A. HUNT
United States District Judge